TRAFFIX USA, INC.

          **Plaintiff,**

vs.

**BRANDON BAY and LOGISTICS GROUP INTERNATIONAL, INC.**

          **Defendants.**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Docket No.**

<u>**Civil**</u> <u>**Action**</u>

## <u>COMPLAINT</u>

Plaintiff Traffix USA Inc. ("Traffix" or "Plaintiff"), by and through its attorneys Rubenstein Business Law, with their principal place of business located at 141 W. Jackson Blvd. Suite 2010A, Chicago, IL 60604 complaining of Defendants Brandon Bay and Logistics Group International, Inc. (collectively "Defendants"), say:

## <u>PARTIES</u>

1.     Plaintiff Traffix USA Inc. is a corporation in good standing organized under the laws of Delaware, with its principal place of business located at 141 W. Jackson Blvd. Suite 2010A, Chicago, IL 60604.

2.     Defendant Brandon Bay ("Bay") is located at 2909 Fly Road Santa Fe, TN, 38482.

3.     Defendant Logistics Group International, Inc. ("LGI") is located at 1426 N Post Oak Rd., Houston, TX 77055.

## <u>JURISDICTION AND VENUE</u>

4.     This Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law.  This Court has supplemental jurisdiction over

1

the related state law claims pursuant to 28 U.S.C. § 1367(a). The Court also has jurisdiction based on diversity of citizenship because the Plaintiff and Defendants are from different states and the matter in controversy exceeds $100,000.

5.    Venue is proper in, and Defendants are subject to the personal jurisdiction of, this Court because Bay agreed via contract to be subject to jurisdiction in this District, and most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b).

## <u>FACTS COMMON TO ALL COUNTS</u>

6.    Plaintiff seeks injunctive and monetary relief to protect itself from the improper and unfair actions of Bay who breached his duty of loyalty to Traffix, violated his non-compete restrictions, and is using confidential information learned in his employment to actively solicit clients of Traffix. Likewise, LGI knowingly hired Bay even though LGI was aware of his non-competition restrictions, and now LGI is profiting from the use of Traffix's confidential information in order to tortuously interfere with Traffix's customer relationships.

7.    Traffix is a long-standing third-party logistics specialist. Traffix is backed by more than three decades of experience serving a wide range of industry sectors across North America. Traffix has built its business on fostering quality customer relationships and respect for others in the industry.

8.    Plaintiff's roots go back to 1974, when Chuck Snow left his family's floral import business to answer the call of the open road and become the owner-operator of his own rig. Five years later, he launched Plaintiff as a load broker and third-party logistics company focused on injecting a customer service philosophy into an industry which at the time was riddled with regulation, inefficiencies and unfair pricing practices.

9.    At the time, a few select companies had specific licenses to service different lanes,

meaning those companies controlled the roads and took advantage of clients who had little choice in the marketplace. There were massive inefficiencies in the system, and carriers travelled countless miles with empty rigs. As one of Canada's first load brokers, Plaintiff reduced cost and worked to eradicate "empty" miles, increased overall efficiencies, and focused on developing long-lasting relationships with its customers.

10.    Thereafter, Plaintiff expanded its operations into the United States and now has offices in several states, including Illinois, Michigan, and Colorado.

<u>**COUNT I**</u>
**<u>BREACH OF CONTRACT OF EMPLOYEE NON-COMPETITION, NON-SOLICITATION, AND NON-DISCLOSURE AGREEMENT</u>**
**<u>(against Bay)</u>**

11.    Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1 through 10 as if same were set forth at length herein.

12.    On December 20, 2019, Brandon Bay accepted employment with Traffix.

13.    In conjunction with his employment, on December 20, 2019, Bay signed an Employee Non-Competition, Non-Solicitation, and Non-Disclosure Agreement.  <u>See</u> Exhibit A.

14.    Pursuant to Section 2, Bay agreed not to utilize Traffix' confidential information for any other purpose other than Traffix business.  <u>See</u> Exhibit A, Section 2.

15.    Pursuant to Section 3, Bay agreed to return all company documents and confidential information upon termination. <u>See</u> Exhibit A, Section 3.

16.    Pursuant to Section 4, Bay agreed not to engage employment with any company that competes with Traffix for one year following termination. <u>See</u> Exhibit A, Section 4.  Specifically, the Agreement stated:

Non-Competition. Employee covenants and agrees that at all times during

3

Employee's employment by Traffix, and for a period of One (1) year following termination of Employee's employment for any reason or no reason, Employee shall not, directly or indirectly, individually or jointly, own any interest in, operate, join, control or participate as a partner, director, principal, officer or agent of, enter into the employment of, act as a consultant to, or perform any services for any person or entity (other than Traffix), that engages in any business activities within the Restricted Area that is competitive with or substantially the same as or substantially similar to the business in which Traffix is engaged during the twelve (12) month period prior to the termination of Employee's employment.

17.     Pursuant to Section 5, Bay agreed not to solicit any clients of Traffix for 2 years following termination of employment. Specifically, Section 5 states:

Representative agrees that an essential element of the business of Traffix is the development and maintenance of personal contacts and relationships with customers. Because of these contacts and relationships, it is common for customers to develop identification with the Representative who services its particular needs. The personal identification of customers with a Traffix Representative creates the potential for the Representative's appropriation of the benefits of the relationship developed with customers on behalf of, and at the time, effort and expense of, Traffix. Therefore, at all times during Representative's employment by Traffix, and for a period of twenty-four (24) months following termination of Representative's employment for any reason or no reason:

Representative, except as part of Representative's duties as an Representative of Traffix, shall not directly or indirectly (including as an owner, investor, lender, sole proprietor, Representative, independent contractor, leased Representative, consultant or otherwise), for Representative's benefit or on behalf of any other person or entity, for the purpose of entering into a Restricted Transaction, solicit, call on, service or enter into any agreement with any customer with whom any member of Traffix did any business within the twelve (12) month period preceding the termination of Representative's employment with Traffix, and with whom Representative had contact for the purpose of a Restricted Transaction, for whom Representative had supervisory responsibility, or about whom Representative had access to Confidential Information.

See Exhibit A, Section 5.

18.     Pursuant to Section 8, Bay agreed that wrongful disclosure of confidential information or breach of the non-compete restrictions would cause irreparable harm. Specifically, Section 8 states:

4

> Employee acknowledges that the restrictions set forth in Paragraphs 2 through 8 of this Agreement are necessary and reasonable to protect Traffix's Confidential Information and relationships with customers and employees. Employee further acknowledges that the competitive positions of Traffix are highly dependent on the Confidential Information and Traffix's relationships with customers and employees with whom it does business, and that any wrongful disclosure of Confidential Information or other breach of this Agreement will cause immediate and irreparable harm to Traffix for which Traffix and such other entities will incur irreparable harm and have no adequate remedy at law. In light of this understanding, Employee agrees that, in the event Employee later believes that any provision hereof is not enforceable for any reason, Employee agrees not to act in violation of any such provision until such time as a court of competent jurisdiction enters a final judgment with respect to enforceability. In the event Employee breaches or threatens to breach any provision hereof, Traffix shall be entitled to entry of an injunction without imposition of any bond prohibiting the same, in addition to any other remedy or relief that may be available to Traffix at law or in equity. If Employee breaches any provision herein, the time periods relating to the restrictions above shall be extended for a period of time equal to that period of time during which Employee was in breach. If Traffix initiates litigation to enforce this Agreement, Traffix shall be entitled to recover from Employee reasonable attorneys' fees and costs incurred in such litigation.

See Exhibit A, Section 8.

19. Pursuant to Section 9, Bay agreed that if any of the provisions of the agreement were not enforceable or overbroad, the Court is permitted to modify them.

20. Pursuant to Section 17, Bay agreed that he received $100 as separate consideration for signing this Agreement. Specifically, Section 17 states: "Consideration. In consideration for signing this Agreement and voluntarily accepting these restrictions, Employee acknowledges receipt of $100 from Traffix." This consideration was separate and distinct from Bay's employment. See Exhibit A.

21. During the course of Bay's employment with Plaintiff, Plaintiff trusted Bay with trade secrets and confidential information concerning how Plaintiff transacts business and generates revenue.

22. This information was developed by Plaintiff through extensive time and cost and is unavailable to the general public. This information cannot be duplicated by reference to telephone

directories or industry publications, and is unknown to Plaintiff's competitors.

23.     While employed with Plaintiff, Bay saw first hand that developing customer relationships takes numerous years to effectuate, and requires substantial amounts of money. Clients and Vendors are difficult to acquire because they stay with competitors for many years and are hesitant to leave.  Creating trust with clients and vendors requires extensive personal contact, and knowing the inner workings of each client/vendor's business. Plaintiff's relationships with its customers/vendors last decades, and take place on a daily basis.  The customer relationship is near permanent and, but for Bay's association with Plaintiff, Bay would not have had contact with the customers in question.

24.     While employed with Plaintiff, Bay saw that Plaintiff takes extensive steps to protect its trade secrets and confidential information.  These steps include:

- All Traffix data is stored in a secure, tier III data center.
- All communications between Traffix staff and the data center is encrypted.  External access to our TMS is not possible.
- Traffix uses a single identity management system for all staff to access systems.
- Geo Blocking is enabled to prevent unauthorized access from countries outside of where Traffix has staff.
- Multi Factor Authentication is being rolled out to all Traffix employees to further prevent unauthorized access.
- Technology Operations regularly reviews system logs to detect unusual traffic or access.
- Endpoint protection is installed on all Traffix workstations.

25.     On October 1, 2020, Bay ceased employment with Traffix.

26.     Since termination, Plaintiff learned that Bay entered into a business relationship with two others, Scott Pasciak and Adam Williams, in order to compete with Traffix in violation of Bay's agreement.

27.     Specifically, Plaintiff learned about this new business arrangement via a text message conversation between Traffix' broker, Brent Orsuga, and Steve, owner of Freight Tec. In the text message, the owner of Freight Tec, a competitor of Traffix, confirmed that he had a meeting scheduled with Brandon Bay, Scott Pasciak, and Adam Williams who had proposed working for Freight Tec and generating $100,000 in Gross Profit in 12 months.  Although Freight Tec ultimately

canceled the meeting and did not hire Bay, Bay's motives to work for a competitor in violation of his agreement was evident.  See Exhibit C.

28.     Additionally, Plaintiff learned that Bay has taken a new job with LGI, a competitor of Traffix, in violation of Section 4 of his agreement.  Bay's role for LGI is to conduct sales and to solicit former clients of Traffix.

29.     It is clear that Bay has used confidential information from Traffix to solicit his clients from Traffix in order to benefit his new employer in violation of Section 5 of the Agreement.  For example, Plaintiff has learned that Bay has already solicited Traffix clients, Kinexo and Fresh Results, to take their business to Logistics Group International thereby causing damages to the Plaintiff.

30.     Bay acquired this information solely through his employment and subsequently attempted to use it for his own gains. It is clear that Bay misappropriated Traffix's confidential information, including detailed customer lists and contact information in order to steal Traffix's clients.

31.     Plaintiff is in urgent need of injunctive relief to prohibit Bay from violating the Non-Compete and Confidentiality Agreements and LGI from tortuously interfering with Traffix's customer relationships.

32.     Bay admitted in his agreements that violations would result in irreparable harm to Plaintiff.  In that event that Bay is not stopped, Plaintiff will suffer irreparable harm in the loss of its business relationships which Plaintiff spent substantial time and money developing.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Bay for the following relief:

A. Compensatory damages.

B. An award to Plaintiff of its costs and expenses, including reasonable attorney's fees, in

bringing this action; and

C. Such other and further relief as the Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT OF CONFIDENTIALITY AGREEMENT
### (against Bay)

33. Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1 through 32 as if same were set forth at length herein.

34. On December 20, 2019, Bay executed a Confidentiality Agreement. See Exhibit B.

35. The Agreement mandated that Bay would not "disclose or use any Confidential Information that [he] may have learned during [his] employment in any way without the express written authorization of the Company."

36. Additionally, he acknowledged that if you were to use "the Company's Confidential Information acquired during my employment with the Company to compete directly or indirectly with the Company, the Company would be placed at a severe competitive disadvantage…"

37. This information was developed by Plaintiff through extensive time and cost and is unavailable to the general public. This information cannot be duplicated by reference to telephone directories or industry publications, and is unknown to Plaintiff's competitors.

38. While employed with Plaintiff, Bay saw first hand that developing customer relationships takes numerous years to effectuate, and requires substantial amounts of money. Clients and Vendors are difficult to acquire because they stay with competitors for many years and are hesitant to leave. Creating trust with clients and vendors requires extensive personal contact, and knowing the inner workings of each client/vendor's business. Plaintiff's relationships with its customers/vendors last decades, and take place on a daily basis. The customer relationship is near permanent and, but for Bay's association with Plaintiff, Bay would not have had contact with the customers in question.

39.     While employed with Plaintiff, Bay saw that Plaintiff takes extensive steps to protect its trade secrets and confidential information.  These steps include:

- All Traffix data is stored in a secure, tier III data center.
- All communications between Traffix staff and the data center is encrypted.  External access to our TMS is not possible.
- Traffix uses a single identity management system for all staff to access systems.
- Geo Blocking is enabled to prevent unauthorized access from countries outside of where Traffix has staff.
- Multi Factor Authentication is being rolled out to all Traffix employees to further prevent unauthorized access.
- Technology Operations regularly reviews system logs to detect unusual traffic or access.
- Endpoint protection is installed on all Traffix workstations.

40.     After Bay's termination, Traffix also learned that Bay had violated his agreement while employed at Traffix.  In August 2020, Bay interviewed a candidate, Adam Williams, for a position with Traffix.

41.     Although Williams was never hired by Traffix, Bay inexplicably sent Williams an email on August 25, 2020 which included Traffix' confidential and proprietary information. Contrary to any assertion by Bay, this was not an "informational spreadsheet" about the opportunity. This was a sheet that contained all of Bay's customers, loads, profitability, margin, and other proprietary information.

42.     Contrary to any assertion by Bay, this was not information that "was necessary to carry out his duties for the company." In fact, Traffix reviewed all of Bay's emails and not a single other email with this spreadsheet was sent to any other job application or interviewee.

43.     The fact that this was sent specifically to Williams only, coupled with the fact that Williams and Bay planned to team up together to work for competitors like Freight Tec, demonstrates Bay's true motive in mis-using Traffix's confidential information to work for a competitor in violation of Bay's restrictive covenant.

44.     It is clear that Bay has used confidential information from Traffix to solicit his clients from Traffix in order to benefit his new employer.  Bay acquired this information solely through his

employment and subsequently attempted to use it for his own gains. It is clear that Bay misappropriated Traffix's confidential information, including detailed customer lists and contact information in order to steal Traffix's clients.

45.　　Plaintiff is in urgent need of injunctive relief to prohibit Defendants from violating the Non-Compete and Confidentiality Agreements and from tortuously interfering with Traffix's customer relationships.

46.　　Bay admitted in his agreements that violations would result in irreparable harm to Plaintiff.  In that event that Bay is not stopped, Plaintiff will suffer irreparable harm in the loss of its business relationships which Plaintiff spent substantial time and money developing.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Bay for the following relief:

    A. Compensatory damages.

    B. An award to Plaintiff of its costs and expenses, including reasonable attorney's fees, in bringing this action; and

    C. Such other and further relief as the Court deems just and proper.

## COUNT III

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
## (against Defendants)

47.　　Plaintiff repeats and reiterates each and every allegation contained in Paragraphs 1 through 46 as if set forth herein verbatim and at length.

48.　　Traffix is a long-standing third-party logistics specialist. Traffix is backed by more than three decades of experience serving a wide range of industry sectors across North America.

Traffix has built its business on fostering quality customer relationships and respect for others in the industry.

49.     Traffix has many contractual relationships with different customers and vendors in the logistics industry.  Defendants are aware of Plaintiffs' contractual relationships with its customers and vendors.

50.     Defendants have interfered with Plaintiff's contracts in order to cause Plaintiff harm. The Defendants are using Plaintiff's confidential information including customer lists, pricing info, load info, and contact information.

51.     For example, Plaintiff has learned that Bay has already solicited Traffix clients, Kinexo and Fresh Results, to take their business to Logistics Group International thereby causing damages to the Plaintiff.

52.     Defendants are using this information so that they could steal customers from Traffix.  Defendants are now using this information to interfere with Traffix's business relationships.  Defendants' interference is inappropriate and unlawful.

53.     Defendants continue to tortiously and willfully interfere with Plaintiff's contractual relationships by continuing to communicate with Plaintiff's customers/vendors.

54.     As a direct and proximate cause of Defendants' interference with Plaintiff's contractual relationships, Plaintiff has suffered and continues to suffer irreparable damage and harm.

**WHEREFORE**, Plaintiff respectfully request that the Court enter judgment against Defendants for the following relief:

A.  An award of compensatory damages;

B.  An award of punitive damages against Defendants for their intentional and malicious conduct;

C.  An award to Plaintiff of its costs and expenses, including reasonable attorney's fees, in bringing this action; and

D.  Such other and further relief as the Court deems just and proper.

## COUNT IV

## TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE
### (against Defendants)

55.     Plaintiff repeats and reiterates each and every allegation contained in Paragraphs 1 through 54 as if set forth herein verbatim and at length.

56.     As described above, Defendants have tortiously and wrongfully interfered with Plaintiff's prospective economic advantage by, among other things, contacting Plaintiff's customers/vendors in order to thwart potential sales.

57.     For example, Plaintiff has learned that Bay has already solicited Traffix clients, Kinexo and Fresh Results, to take their business to Logistics Group International thereby causing damages to the Plaintiff.

58.     The Defendants are using Plaintiff's confidential information including customer lists, pricing info, load info, and contact information.

59.     Defendants stole this information so that they could steal customers from Traffix. Defendants are now using this information to interfere with Traffix's business relationships. Defendants' interference is inappropriate and unlawful.

60.     Defendants continue to tortiously and willfully interfere with Plaintiff's contractual relationships by continuing to communicate with Plaintiff's customers/vendors.

61.     As a direct and proximate result of Defendants' interference with Plaintiff's prospective economic advantage, Plaintiff suffers and continues to suffer irreparable damage and

harm.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants for the following relief:

A. An award of compensatory damages;

B. An award of punitive damages against Defendants for their intentional and malicious conduct;

C. An award to Plaintiff of its costs and expenses, including reasonable attorney's fees, in bringing this action; and

D. Such other and further relief as the Court deems just and proper.

## COUNT V

### Injunctive Relief
### (against Defendants)

62.     Plaintiff repeats and reiterates each and every allegation contained in Paragraphs 1 through 61 as if set forth herein verbatim and at length.

63.     During the course of Bay's employment with Plaintiff, Plaintiff trusted Bay with trade secrets and confidential information concerning how Plaintiff transacts business and generates revenue.

64.     This information was developed by Plaintiff through extensive time and cost and is unavailable to the general public.  This information cannot be duplicated by reference to telephone directories or industry publications, and is unknown to Plaintiff's competitors.

65.     While employed with Plaintiff, Bay saw first hand that developing customer relationships takes numerous years to effectuate, and requires substantial amounts of money. Clients and Vendors are difficult to acquire because they stay with competitors for many years and are hesitant to leave.  Creating trust with clients and vendors requires extensive personal contact, and knowing the

inner workings of each client/vendor's business. Plaintiff's relationships with its customers/vendors last decades, and take place on a daily basis.

66.     While employed with Plaintiff, Defendants saw that Plaintiff takes extensive steps to protect its trade secrets and confidential information. These steps include:

- All Traffix data is stored in a secure, tier III data center.
- All communications between Traffix staff and the data center is encrypted. External access to Defendants' TMS is not possible.
- Traffix uses a single identity management system for all staff to access systems.
- Geo Blocking is enabled to prevent unauthorized access from countries outside of where Traffix has staff.
- Multi Factor Authentication is being rolled out to all Traffix employees to further prevent unauthorized access.
- Technology Operations regularly reviews system logs to detect unusual traffic or access.
- Endpoint protection is installed on all Traffix workstations.

67.     The Defendants are now using Plaintiff's confidential information including customer lists, pricing info, load info, and contact information. Defendants are using this information so that they could steal customers from Traffix. Defendants are now using this information to interfere with Traffix's business relationships. Defendants' interference is inappropriate and unlawful.

68.     For example, Plaintiff has learned that Bay has already solicited Traffix clients, Kinexo and Fresh Results, to take their business to Logistics Group International thereby causing damages to the Plaintiff.

69.     Defendants continue to tortiously and willfully interfere with Plaintiff's contractual relationships by continuing to communicate with Plaintiff's customers/vendors.

70.     As a direct and proximate result of Defendants' interference with Plaintiff's breach of their non-compete agreements and fraudulent conduct, Plaintiff suffers and continues to suffer irreparable damage and harm.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants

for the following relief:

    A.  Injunctive Relief to prevent the Defendants from interfering with Plaintiff's business.

    B.  Injunctive Relief to prevent the Defendants from soliciting any clients of Traffix with whom Defendants previously worked.

    C.  Injunctive Relief to prevent Bay from working in a sales capacity for a competitor of Traffix.

    D.  An award to Plaintiff of its costs and expenses, including reasonable attorney's fees, in bringing this action; and

    E.  Such other and further relief as the Court deems just and proper.

## COUNT VI

## BREACH OF DUTY OF LOYALTY
### (against Bay)

71.    Plaintiff repeats and reiterates each and every allegation contained in Paragraphs 1 through 70 as if set forth herein verbatim and at length.

72.    Due to employment with Plaintiff, Bay owed a duty of loyalty to Plaintiff.

73.    Bay breached that duty of loyalty by, using Plaintiff's confidential information in order to misappropriate Plaintiff's trade secrets.

74.    In August 2020, Bay interviewed a candidate, Adam Williams, for a position with Traffix.

75.    Although Williams was never hired by Traffix, Bay inexplicably sent Williams an email on August 25, 2020 which included Traffix' confidential and proprietary information. Contrary to any assertion by Bay, this was not an "informational spreadsheet" about the opportunity. This was a sheet that contained all of Bay's customers, loads, profitability, margin, and other

proprietary information.

76. Contrary to any assertion by Bay, this was not information that "was necessary to carry out his duties for the company." In fact, Traffix reviewed all of Bay's emails and not a single other email with this spreadsheet was sent to any other job application or interviewee.

77. The fact that this was sent specifically to Williams only, coupled with the fact that Williams and Bay planned to team up together to work for competitors like Freight Tec, demonstrates Bay's true motive in mis-using Traffix's confidential information to work for a competitor in violation of Bay's restrictive covenant.

78. As a result of this breach, Bay has proximately caused damage to the Plaintiff.

79. Plaintiff has suffered damages as a result of Bay's unlawful conduct.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Bay for the following relief:

A. An award of compensatory damages;

B. An award of punitive damages against Bay for his intentional and malicious conduct;

C. An award to Plaintiff of its costs and expenses, including reasonable attorney's fees, in bringing this action; and

D. Such other and further relief as the Court deems just and proper.

## COUNT VII

## VIOLATION OF ILLINOIS TRADE SECRETS ACT
### (against Defendants)

80. Plaintiff repeats and reiterates each and every allegation contained in Paragraphs 1 through 79 as if set forth herein verbatim and at length.

16

81.     The Illinois Trade Secrets Act ("ITSA") defines a "trade secret" as information "including, but not limited to technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers" that is (a) sufficient secret to derive economic value . . . from not being generally known to other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. 765 ILCS 1065/2(d).

82.     A person misappropriates a trade secret by, among other things, disclosing the trade secret despite knowing that it was "acquired under circumstances giving rise to a duty to maintain its secrecy or limits its use" or from a person who had a duty to maintain its secrecy or use. 765 ILCS 1065/2(b)(2)(B)(II) and (III).

83.     The ITSA authorizes relief to remedy "actual or threatened misappropriation" of trade secrets. 765 ILCS 1065/3(a). Illinois law permits relief upon a showing that a person's new employment will inevitably lead him or her to rely on the trade secrets.

84.     Plaintiff took affirmative measures to keep its confidential and proprietary information secret. For example, Plaintiff took the following steps:

- All Traffix data is stored in a secure, tier III data center.
- All communications between Traffix staff and the data center is encrypted.  External access to Traffix's TMS is not possible.
- Traffix uses a single identity management system for all staff to access systems.
- Geo Blocking is enabled to prevent unauthorized access from countries outside of where Traffix has staff.
- Multi Factor Authentication is being rolled out to all Traffix employees to further prevent unauthorized access.
- Technology Operations regularly reviews system logs to detect unusual traffic or access.
- Endpoint protection is installed on all Traffix workstations.

85.     The Defendants are now using Plaintiff's confidential information including

customer lists, pricing info, load info, and contact information. Defendants are using this information so that they could steal customers from Traffix. Defendants are now using this information to interfere with Traffix's business relationships. Defendants' interference is inappropriate and unlawful.

86. Defendants continue to tortiously and willfully interfere with Plaintiff's contractual relationships by continuing to communicate with Plaintiff's customers/vendors.

87. As a direct and proximate result of Defendants' interference with Plaintiff's breach of their non-compete agreements and fraudulent conduct, Plaintiff suffers and continues to suffer irreparable damage and harm.

88. As a direct and proximate result of Defendants' actual and threatened misappropriation of Plaintiff's trade secrets and confidential information, Plaintiff has suffered damages.

89. Therefore, pursuant to Section 4 of the ITSA, Plaintiff is entitled to recover damages. See 765 ILCS 1065/4.

90. By reason of Defendants willful and malicious acts, Plaintiff is entitled to an award of exemplary damages from Defendants in such amounts as is necessary to punish Defendants and deter them from commission of like acts and, in addition, reasonable attorney's fees pursuant to Section 5 of the ITSA. See 765 ILCS 1065/5.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants for the following relief:

    A. An award of compensatory damages;

    B. An award of punitive damages against Defendants for their intentional and malicious conduct;

    C. An award to Plaintiff of its costs and expenses, including reasonable attorney's fees,

in bringing this action; and

D. Such other and further relief as the Court deems just and proper.

## COUNT VIII

## VIOLATION OF DEFEND TRADE SECRETS ACT

### (18 U.S. Code § 1836)
### (against Defendants)

91.     Plaintiff repeats and reiterates each and every allegation contained in Paragraphs 1 through 90 as if set forth herein verbatim and at length.

92.     The Defend Trade Secrets Act ("DTSA"), enacted on May 11, 2016, provides the first private federal cause of action for trade secret misappropriation and allows employers whose trade secrets have been misappropriated to head straight to the federal courts.  The DTSA also offers extensive remedies such as *ex parte* seizure of property, injunctive relief, monetary damages for actual loss, unjust enrichment, and a potential for reasonable royalties.

93.     Under the DTSA, a plaintiff can allege misappropriation of trade secrets in one of two ways: (1) due to acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent.

94.     The DTSA allows an employer to seek restitution for the value of its misappropriated trade secrets.  Under the "inevitable disclosure doctrine" a plaintiff may "prove a claim of trade secret misappropriation by demonstrating that the defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets."

95.     In making this determination, courts consider whether: (1) the plaintiff and defendant's new company are direct competitors; (2) the employee's new position is comparable to

his or her former position; and (3) the new employer has taken any action to prevent the former employee from using or disclosing trade secrets.

96.     During the course of Bay's employment with Plaintiff, Plaintiff trusted Bay with trade secrets and confidential information concerning how Plaintiff transacts business and generates revenue.

97.     This information was developed by Plaintiff through extensive time and cost and is unavailable to the general public. This information cannot be duplicated by reference to telephone directories or industry publications, and is unknown to Plaintiff's competitors.

98.     While employed with Plaintiff, Defendants saw first hand that developing customer relationships takes numerous years to effectuate, and requires substantial amounts of money. Clients and Vendors are difficult to acquire because they stay with competitors for many years and are hesitant to leave. Creating trust with clients and vendors requires extensive personal contact, and knowing the inner workings of each client/vendor's business. Plaintiff's relationships with its customers/vendors last decades, and take place on a daily basis.

99.     While employed with Plaintiff, Bay saw that Plaintiff takes extensive steps to protect its trade secrets and confidential information. These steps include:

- All Traffix data is stored in a secure, tier III data center.
- All communications between Traffix staff and the data center is encrypted. External access to Defendants' TMS is not possible.
- Traffix uses a single identity management system for all staff to access systems.
- Geo Blocking is enabled to prevent unauthorized access from countries outside of where Traffix has staff.
- Multi Factor Authentication is being rolled out to all Traffix employees to further prevent unauthorized access.
- Technology Operations regularly reviews system logs to detect unusual traffic or access.
- Endpoint protection is installed on all Traffix workstations.

100.     The Defendants are now using Plaintiff's confidential information including customer lists, pricing info, load info, and contact information. Defendants are using this information so that they could steal customers from Traffix. Defendants are now using this information to interfere with

Traffix's business relationships. Defendants' interference is inappropriate and unlawful.

101. The Plaintiff and Bay's new company are direct competitors.

102. Bay's position at LGI is comparable to his former position.

103. LGI has not taken any action to prevent the former employee from using or disclosing trade secrets.

104. Defendants continue to tortiously and willfully interfere with Plaintiff's contractual relationships by continuing to communicate with Plaintiff's customers/vendors leading to the inevitable disclosure of Plaintiff's trade secrets.

105. As a direct and proximate result of Defendants' interference with Plaintiff's breach of their non-compete agreements and fraudulent conduct, Plaintiff suffers and continues to suffer irreparable damage and harm.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants for the following relief:

A. An award of compensatory damages;

B. An award of punitive damages against Defendants for their intentional and malicious conduct;

C. An award to Plaintiff of its costs and expenses, including reasonable attorney's fees, in bringing this action; and

D. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

s/David Rubenstein

David Rubenstein, Esq.

Rubenstein Business Law

30 S. Wacker Drive, 22nd Flr.
Chicago, IL 60606
(312) 466-5612
Drubenstein@RubensteinBusinessLaw.com

# EXHIBIT A





May 29, 2020

Brandon Bay
2909 Fly Road
Santa Fe, TN 38482

**Private and Confidential**

Dear Brandon,

This letter is to outline that effective June 1, 2020 your annual compensation will be adjusted from $115,000 to $125,000 for achieving $50,000 gross profit 3 months in a row or collectively. This new compensation will be reflected on your June 12, 2020 pay.

In the event the employee fails to meet expectations and gross profit decreases no more than 15% over a period of 3 months, the employee will be issued a Compensation and Commissions Amendment stipulating a wage deduction.

On behalf of Traffix, I thank you for your continued hard-work and dedication to your position.

Sincerely,

Gregory Shnerer (May 29, 2020 11:36 EDT)

Greg Shnerer
VP, Corporate Strategy

cc.      Personnel File

*Brandon Bay*

_____                    May 29, 2020
Employee Signature                                 _____
                                                   Date

By signing above, I acknowledge that I have read and understood this letter and agree to the adjusted annual salary as described herein.

#1 – 375 Wheelabrator Way
Milton, Ontario L9T 3C1

## EMPLOYEE NON-COMPETITION, NON-SOLICITATION AND NON-DISCLOSURE AGREEMENT

THIS EMPLOYEE NON-SOLICITATION AND NON-DISCLOSURE AGREEMENT (this "Agreement") is made and entered into at Tennessee, as of ___Jan 6 2020 (date) (the "Effective Date"), by and among ___Bronson Bay ("Employee"), and Traffix.

WHEREAS, Traffix and its respective Affiliates and Subsidiaries (as defined below) possess certain valuable Confidential Information (defined below) that gives them a competitive advantage;

WHEREAS, Traffix (as defined below) has developed and maintained, at substantial expense and over a considerable period of time, relationships with customers, vendors, employees and others that likewise give Traffix a competitive advantage;

WHEREAS, as a result of being employed by Traffix, Employee will be given access to, and will assist in, the development and maintenance of Traffix's Confidential Information and its relationships with customers, vendors, employees and others, and it is the parties' intent to safeguard such Confidential Information and relationships both during and after the term of Employee's employment with Traffix;

WHEREAS, as a result of being employed by Traffix, Employee will provide services to Traffix and will be given access to, and will assist in, the development and maintenance of Confidential Information of Traffix, and relationships with Traffix's customers, vendors, employees and others, and it is the parties' intent to safeguard such Confidential Information and relationships both during and after the term of Employee's employment with Traffix and the provision of services to Traffix; and

WHEREAS, Traffix's reputation and present and future competitive position are dependent upon Traffix's ability to protect its interests in such Confidential Information and relationships.

NOW, THEREFORE, in consideration of (i) Traffix employing Employee, (ii) Traffix providing Employee with access to such Confidential Information and customer relationships, and (iii) Traffix providing Employee with access to specialized training, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, Traffix, Holdings and Employee agree as follows:

**1.** **Definitions**. As used herein, the following terms shall be defined as provided below.

"Affiliate" means any entity which is directly or indirectly owned or controlled by, or under common control with Traffix.

"Confidential Information" includes, but is not limited to, any type of trade secret (as defined in the Illinois Uniform Trade Secret Act, 765 ILCS 1065/1 *et seq.)* or other information, whether in hard-copy or electronic format or communicated orally, that Employee acquires through Employee's employment with Traffix, including the provision of services to any other member of Traffix through such employment, and that (x) Traffix designates or treats as confidential through its policies, procedures and/or practices, or (y) any other member of Traffix designates or treats as confidential through its policies, procedures and/or practices. Confidential Information is limited to information that is not generally known to the public, or that is not in the public domain. Examples of Confidential Information include, without limitation, the following: (i) any files, lists or other information relating to customers and compilations of any of the foregoing including, without limitation, identity of parties, correspondence, current and historical proposals, bids and quotes, and contract terms such as pricing, duration and renewal; (ii) non-published pricing and financial information, including, without limitation, financial and business data, product rates and pricing, cost and performance data, pricing factors, and profit and profit margin data; (iii) strategic, marketing and research information including, without limitation, business plans, strategies and market research data; (iv) technical information including, without limitation, software, source code, object code and other non-public intellectual property, and all internal sales, marketing, public affairs, operations and finance operating systems and the data therein; (v) product research and development including, without limitation, testing data, formulas, products in development and all other research data; and (vi) personnel information including, without limitation, performance evaluations and salary, bonus and incentive data.

"Traffix" means one or more of Traffix, and their respective Affiliates and Subsidiaries.

"Restricted Area" shall mean any State of the United States of America or any other jurisdiction in which Traffix is engaged (or has committed plans to engage) in business activities during the term of Employee's employment and in which Employee, on behalf of Traffix performed services or had supervisory responsibility for services performed by others.

"Restricted Transaction" means any business transaction relating to the marketing, selling and/or providing of: (a) freight brokerage, freight forwarding, intermodal, or transportation management services; or (b) the development or sale of freight brokerage or freight optimization software.

"Subsidiary" means any entity of which at least fifty percent (50%) of the equity capital is owned by one or more members of Traffix.

**2. Non-Disclosure of Confidential Information.** Employee acknowledges that Traffix has spent considerable time, effort and expense developing its Confidential Information, and have taken reasonable measures to protect its secrecy. Employee, therefore, agrees that Employee will not, except in the normal and proper course of Employee's duties on behalf of Traffix (including the provision of services to other members of Traffix), disclose or use, or enable anyone else to disclose or use, either during the employment term or at any time subsequent thereto, any Confidential Information without prior written approval from Traffix.

**3. Return of Traffix Property.** Employee agrees that all documents and other materials of any kind pertaining to the business of Traffix (including Confidential Information in any format) in Employee's possession at any time during Employee's employment are and shall

be the property of Traffix and that all such property, including all copies thereof and all such information contained on Employee's computer(s), shall be surrendered by Employee to Traffix upon Traffix's request from time to time during such employment, and with or without request upon termination of Employee's employment.

4. **Non-Competition.** Employee covenants and agrees that at all times during Employee's employment by Traffix, and for a period of One (1) year following termination of Employee's employment for any reason or no reason, Employee shall not, directly or indirectly, individually or jointly, own any interest in, operate, join, control or participate as a partner, director, principal, officer or agent of, enter into the employment of, act as a consultant to, or perform any services for any person or entity (other than Traffix), that engages in any business activities within the Restricted Area that is competitive with or substantially the same as or substantially similar to the business in which Traffix is engaged during the twelve (12) month period prior to the termination of Employee's employment.

5. Employee agrees that an essential element of the business of Traffix is the development and maintenance of personal contacts and relationships with customers. Because of these contacts and relationships, it is common for customers to develop identification with the employee who services its particular needs. The personal identification of customers with a Traffix employee creates the potential for the employee's appropriation of the benefits of the relationship developed with customers on behalf of, and at the time, effort and expense of, Traffix. Therefore, at all times during Employee's employment by Traffix, and for a period of twenty-four (24) months following termination of Employee's employment for any reason or no reason:

(a) Employee, except as part of Employee's duties as an employee of Traffix, shall not directly or indirectly (including as an owner, investor, lender, sole proprietor, employee, independent contractor, leased employee, consultant or otherwise), for Employee's benefit or on behalf of any other person or entity, for the purpose of entering into a Restricted Transaction, solicit, call on, service or enter into any agreement with any customer with whom any member of Traffix did any business within the twelve (12) month period preceding the termination of Employee's employment with Traffix, and with whom Employee had contact for the purpose of a Restricted Transaction, for whom Employee had supervisory responsibility, or about whom Employee had access to Confidential Information; and

(b) Employee shall not, directly or indirectly, for Employee's benefit or on behalf of any other person or entity, (i) solicit, induce or encourage any employee of Traffix to leave such employee's employment with Traffix or to cease such employee's relationship with Traffix; or (ii) hire or attempt to hire any employee of Traffix.

6. **Nondisparagement.** During the period of Employee's employment and for two (2) years following termination of Employee's employment for any reason or no reason, Employee shall not, directly or indirectly, disparage Traffix, or any of their respective employees, products, or services.

7. **Inventions and Patents.**

(a) Employee will promptly and fully disclose to Traffix any and all "Inventions, Discoveries, and Improvements," whether or not patentable and whether or not they are made, conceived or reduced to practice during working hours or using Traffix's data or facilities. which

Employee develops, makes, conceives or reduces to practice during Employee's employment by Traffix, either solely or jointly with others. For purposes of this Agreement, the terms "Inventions, Discoveries, and Improvements" shall include, without limitation, all ideas, potential marketing and sales relationships, inventions, research, plans for products or services, marketing plans, computer software (including source code and object code), computer programs, original works of authorship, characters, know-how, trade secrets, information, data, developments, discoveries, improvements, modifications, technology, algorithms, and designs, whether or not subject to patent or copyright protection. Employee acknowledges and agrees that all such Inventions, Discoveries, and Improvements shall be the sole property of Traffix, and Employee hereby assigns to Traffix, without further compensation, all of Employee's right, title and interest in and to such Inventions, Discoveries, and Improvements, together with any and all related patents, patent applications, copyrights, copyright applications, trademarks and trade names in the United States and elsewhere. Notwithstanding anything herein to the contrary, no provision of this. Agreement is intended to assign any of Employee's rights in an Invention, Discovery or Improvement for which no equipment, supplies, facilities or trade secret information of Traffix was used and that was developed entirely on Employee's own time, unless the Invention, Discovery or Improvement relates to the business of Traffix or to Traffix's actual or demonstrably anticipated research or development, or unless the Invention, Discovery or Improvement resulted from any work performed by Employee for Traffix.

(b) Employee will keep and maintain adequate and current written records of all Inventions, Discoveries, and Improvements (in the form of notes, sketches, drawings, and as may be specified by Traffix), which records shall be available to and remain the sole property of Traffix at all times.

(c) Employee will assist Traffix in obtaining and enforcing patent, copyright and other forms of legal protection for the Inventions, Discoveries, and Improvements in any country. Upon request, Employee will sign all applications, assignments, instruments, and papers and perform all acts necessary or requested by Traffix and to enable Traffix, its successors, assigns and nominees to secure and enjoy the full, exclusive benefits and advantages thereof.

**8.     Enforceability.** Employee acknowledges that the restrictions set forth in Paragraphs 2 through 8 of this Agreement are necessary and reasonable to protect Traffix's Confidential Information and relationships with customers and employees. Employee further acknowledges that the competitive positions of Traffix are highly dependent on the Confidential Information and Traffix's relationships with customers and employees with whom it does business, and that any wrongful disclosure of Confidential Information or other breach of this Agreement will cause immediate and irreparable harm to Traffix for which Traffix and such other entities will incur irreparable harm and have no adequate remedy at law. In light of this understanding, Employee agrees that, in the event Employee later believes that any provision hereof is not enforceable for any reason, Employee agrees not to act in violation of any such provision until such time as a court of competent jurisdiction enters a final judgment with respect to enforceability. In the event Employee breaches or threatens to breach any provision hereof, Traffix shall be entitled to entry of an injunction without imposition of any bond prohibiting the same, in addition to any other remedy or relief that may be available to Traffix at law or in equity. If Employee breaches any provision herein, the time periods relating to the restrictions above shall be extended for a period of time equal to that period of time during which Employee was in breach. If Traffix

initiates litigation to enforce this Agreement, Traffix shall be entitled to recover from Employee reasonable attorneys' fees and costs incurred in such litigation.

**9.** **Severability/Reasonable Alteration.** In the event that any part or provision of this Agreement shall be held to be invalid or unenforceable by a court of competent jurisdiction, the remaining provisions thereof shall nevertheless continue to be valid and enforceable as though the invalid or unenforceable part or provision had not been included therein. Further, in the event that any part or provision hereof shall be declared by a court of competent jurisdiction to exceed the maximum time period, scope or activity restriction that such court deems reasonable and enforceable, then the parties expressly authorize the court to modify such part or provision so that it may be enforced to the maximum extent permitted by law.

**10.** **Absence of Restrictions.**

(a) Employee hereby represents that, except as Employee has disclosed in writing to Traffix, Employee is not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing trade secret or confidential or proprietary information in the course of Employee's employment with Traffix or to refrain from competing, directly or indirectly, with the business of such previous employer or any other person or entity.

(b) Employee further represents that Employee's performance of all of the terms of this Agreement and Employee's duties as an employee of Traffix does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by Employee in confidence or in trust prior to Employee's employment with Traffix, and Employee will not disclose to Traffix or induce Traffix to use any confidential or proprietary information or material belonging to any previous employer or any other person or entity.

11. **Survival.** Employee and Traffix agree that the restrictions set forth in Paragraphs 2 through 8 of this Agreement shall survive the termination of this Agreement and the termination of Employee's employment with Traffix for any reason or no reason.

**12.** **Assignability and Binding Effect.** This Agreement may be assigned by Traffix and shall otherwise inure to the benefit of, and be binding and effective upon, Traffix's successors and/or assigns.

**13.** **Duty to Disclose.** Employee shall disclose the existence and terms of this Agreement to any subsequent potential employer or principal who competes in any way, whether directly or indirectly, with Traffix for business or employees.

**14.** **Notices.** All notices, requests, consents, and other communications due under this Agreement shall be in writing and shall be deemed to be delivered on the date personally served or faxed, or if sent by certified U.S. mail, return receipt requested, within five (5) days of deposit of such mail into a U.S. Postal Service mail receptacle, addressed to Employee at the address set forth on the signature page hereto, or to Traffix as follows:

> Traffix
> 1-375 Wheelabrator Way,
> Milton. ON, L9T3C1

15.     **Entire Agreement.** This Agreement supersedes any prior agreements or understandings, oral or written, with respect to employment of Employee and constitutes the entire agreement with respect thereto. This Agreement cannot be changed or terminated orally and may be modified only by subsequent written agreement executed by both Employee and Traffix.

16.     **Applicable Law, Venue and** Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to conflicts of laws principles, rules or statutes of any jurisdiction. The parties agree to the application of Illinois law because, among other things, Traffix and Employee have a material connection to the State of Illinois as the location of Traffix's principal place of business in the United States of America, and application of a single state's law will permit a uniform and consistent interpretation of the provisions herein to all persons who occupy similar positions with Traffix and who sign like agreements. The exclusive venue for any litigation between Employee and Traffix for any dispute arising out of this Agreement or relating in any way to Employee's employment with Traffix shall be the state or federal courts located in Cook County, Illinois, and Employee hereby consents to any such court's exercise of personal jurisdiction over Employee for such purpose.

17.     **Consideration.**   In consideration for signing this Agreement and voluntarily accepting these restrictions, Employee acknowledges receipt of $100 from Traffix.

**IN WITNESS WHEREOF,** Employee and Traffix have executed this Agreement as of the date set forth above.

**AGREED AND ACCEPTED**

**TRAFFIX**

Dated: _____          by: _____

**EMPLOYEE**

Dated: 12/20/19          by: _____

# EXHIBIT B



## Confidentiality    Agreement

This *Confidentiality   Agreement* (the "Agreement") is made between Traffix USA Inc. (the "Company") and me, the employee whose name is signed on the last page of this Agreement.

**1.      Definitions.** For purposes of this Agreement, the following terms have the meanings specified below.

      **A.**      "Confidential Information" means all non-public information relating to the Company's business, or to the business of any of the Company's subsidiary or affiliated entities. Information that becomes public as a result of my breach of this Agreement will remain "Confidential Information" as defined by this Agreement. Confidential Information also includes, without limitation, all of the following:

            **(1)**      All information constituting a "trade secret" under applicable law.

            **(2)**      All information regarding past, current, and prospective customers and  suppliers, including without limitation contact information and information regarding prior business with the Company.

            **(3)**      All information regarding past, present and future business and  marketing  plans, product offerings, costs, pricing, and financial performance.

            **(4)**      All information that the Company is restricted from disclosing under any applicable law or contract, including information subject to any confidentiality or non-disclosure agreement to which the Company is a party.

      **B.**      Electronically Stored Information ("ESI") means electronic data in any form or on any media, including without limitation e-mail messages, Microsoft Office documents and files, contact and calendar data, scanned documents, and database information.

      **C.**      "Company Documents" means any and all paper documents and ESI relating to the business of the Company, including but not limited to documents and ESI that contain or are derived from any Confidential Information. "Company Documents" does not include    publicly-available documents or documents that relate exclusively to my personal compensation or benefits as an employee of the Company.

**2.      Acknowledgements.** By signing below, I acknowledge the following:

      **A.**      In the course of my employment with the Company, I will learn and have access to a wide range of Confidential Information  regarding  all  aspects of the Company's current and  future business. If I were to use the Company's Confidential Information acquired during my employment with the Company to compete directly or indirectly with the Company, the Company would be placed at a severe competitive disadvantage, for which there is no adequate legal remedy.

      **B.**      The restrictions set forth in this Agreement are reasonable and no broader than necessary to protect the Company's legitimate business interests in its Confidential Information. The



restrictions in this Agreement will not interfere with my ability to obtain employment in my chosen field or earn a satisfactory livelihood following the end of my employment with the Company.

  **C.**  I understand and have been advised, pursuant to the Defend Trade Secrets Act, that an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

**3.**  **Consideration.** I am entering into this Agreement with the Company in consideration for and as a material term and condition of my employment with the Company, and of the Company's agreement to share Confidential Information with me in the course of my employment.

**4.**  **Non-Disclosure of Confidential Information.** I will not access, obtain, disclose, or use any Confidential Information except as reasonably necessary to carry out my job duties for the Company. After my employment with the Company ends for any reason whatsoever, I will not retain any documents or ESI containing any Confidential Information, and I will not disclose or use any Confidential Information that I may have learned during my employment in any way without the express written authorization of the Company.

**5.**  **E-Mail and Electronic Files.**

  **A.**  **Personal use.** I will not use any personal e-mail account owned or controlled by me for Company business, nor will I forward Company Documents to any non-Company e-mail account that I own or control without the express written authorization of my manager. I will not copy Company Documents to any personal computer, device, or account without the express written authorization of my manager.

  **B.**  **Upon Separation.** If I need to retrieve any personal files from a Company computer due to the end of my employment with the Company, I will notify my manager who will make arrangements for the Company's IT staff to copy the files to a disk or portable storage device for me. I understand that files relating to Company business or content that otherwise violates any Company policy will not be copied.

**6.**  **Return of Company Property.** Upon the termination of my employment with the Company for any reason, and upon request of the Company at any time, I will immediately return all Company Documents to the Company. If any I have any Company Documents in my possession on a personal computer, mobile device (such as a smartphone) storage device (such as a USB-drive), or any online or "cloud" service (such as an e-mail account, Dropbox, or Google Docs), I will notify the Company and cooperate with the Company's reasonable efforts to ensure that any Company Documents are securely deleted and not retained after the termination of my employment.



**7.** **No Conflicting Agreement or Obligation.** I represent that my performance of my assigned job duties as an employee of the Company and my compliance with all of the terms of this Agreement does not and will not breach any contractual or other legal obligation that I owe to any former employer or any other entity. I have not entered into, and I agree that I shall not in the future enter into, any agreement with any third party, either written or oral, that conflicts with this Agreement.

**8.** **Enforcement.** If I violate or threaten to violate any provision of this Agreement, the Company will be entitled to temporary, preliminary and permanent injunctive relief against me. The Company will not be required to post a bond in order to obtain a temporary restraining order or preliminary injunction. Any injunctive relief will be in addition to any other relief available under applicable law, including without limitation any compensatory, punitive, exemplary or liquidated damages. I will pay all costs and expenses, including reasonable attorneys' fees, incurred by the Company as a result of any breach of this Agreement. This includes, without limitation, the costs of any investigation, attorney correspondence, and the costs of securely deleting Company documents from any personal computer, device or account. I agree that any legal action with respect to this Agreement may be filed and heard in any state or federal court with general jurisdiction over Dupage County, Illinois, and I irrevocably consent to the jurisdiction of said courts for that purpose.

**9.** **At-Will Employment.** I am employed by the Company on an at-will basis. Nothing in this Agreement constitutes a guarantee of employment for any particular period of time or restricts the right of either me or the Company to terminate my employment at any time and for any or no reason.

**10.** **Choice of Law.** This Agreement will be construed in accordance with the substantive law of the state of Illinois, without regard to conflict of laws principles.

**11.** **No Waiver of Breach.** The Company's failure to insist upon strict compliance with any provision of this Agreement will not be construed as a waiver of its rights under this Agreement. No breach of this Agreement can be waived, except expressly in writing signed by the Company's President. The Company's waiver of any breach will not be deemed a waiver of any other breach unless otherwise specified in writing.

**12.** **Construction and Severability.** Should any court of competent jurisdiction determine that any of the covenants set forth in this Agreement are overbroad in terms of time, geography, or activity restricted, the Company and I agree that the court will revise the restriction and enforce it to the maximum extent it deems legally permissible. Should a court of competent jurisdiction deem any provision of this Agreement unenforceable, the remainder of this Agreement will remain in full force and effect to the maximum extent permitted by law.

**I HAVE READ THIS AGREEMENT CAREFULLY AND UNDERSTAND ITS TERMS. I ACCEPT AND AGREE TO THE TERMS AND CONDITIONS OF THIS AGREEMENT.**

_____          12/20/19
Signature                          Date

BRANSON Buy
Printed Name

# EXHIBIT C

Steve initiated the communication asking me about a "scenario", it then surfaces the 3 names. He mentioned those first.





Steve >

Smells bad

What's Names. I can look it up and know too

So your paying them 45k with what guarantee

It would be structured as a forgivable loan - I could get a judgement against them after suing them - then I would spend money chasing down a way to collect... it would be a big headache if it didn't work

Names:
Brandon Bay
Adam Williams
Scott Pasciak

Dude

I placed Brandon wow

Deal with him daily

Really...

I know this whole story wow

Quick talk?



**Brent Orsuga**

*Founder/ President*

**O:888-645-0555**

**C:602-538-7044**

**Learn more about us, click HERE**

